536 So.2d 226 (1988)
Eduardo LOPEZ, Appellant,
v.
STATE of Florida, Appellee.
No. 68494.
Supreme Court of Florida.
December 22, 1988.
*227 Michael B. Chavies, Miami, for appellant.
Robert A. Butterworth, Atty. Gen., and Richard L. Kaplan, Capital Collateral Coordinator, Miami, for appellee.
PER CURIAM.
Lopez appeals his sentence of death imposed after the trial court adjudicated him guilty of first-degree murder.[1] We have jurisdiction pursuant to article V, section 3(b)(1) of the state constitution. We affirm both the conviction and the death sentence.
In late January 1983 Lopez and two accomplices broke into a home at night, intending to steal a stash of drug money they believed to be hidden in the home. A woman occupied the house with her two teenage daughters and eight-year-old son. At the time of this incident, however, only the mother and son were at home. They had been watching television in the mother's bedroom and had fallen asleep. Awakened by the intruders, the woman screamed, but Lopez put his hand over her mouth and ordered her to be quiet. After the woman bit Lopez' hand, he put a gun to her head. One of Lopez' companions, who were ransacking the bedroom, told Lopez to kill the woman, and he shot her in the side of the face. The son had been awakened by the commotion. Although dazed, the mother remained conscious and heard her son beg Lopez to leave her alone and not to hurt her. She also heard one of Lopez' accomplices tell him to kill the child, after which she heard another muffled shot. The woman survived and identified Lopez as the shooter; the child died.
After being indicted, Lopez entered into a written plea agreement, in June 1984, under which he would receive three life sentences in return for testifying against his accomplices. Should he fail to testify, he would subject himself to consideration of a possible sentence of death on one first-degree murder count. When Lopez refused to testify in 1985, the state moved for enforcement of the bargain. Lopez then moved to set aside the guilty plea and asked for a trial on all issues. After a hearing on these motions in late July and early August 1985, the court granted the state's motion and denied Lopez' motion. Lopez waived sentencing before a jury, and the court held a three-day sentencing hearing in December 1985. In February 1986 the court sentenced Lopez to death.
Lopez now argues that the court erred both by refusing to allow him to withdraw his plea and proceed to trial on all issues and by refusing to set aside the plea as not having been freely and voluntarily made. In testifying before the trial court on the motion to enforce the plea agreement Lopez stated that he did not know that he would have to testify against his accomplices, that he would not have signed the plea agreement if he had understood he would have to testify against them, that his life had been threatened at two state correctional institutions to keep him from testifying against the accomplices, and that his former attorney, Castro, had pressured him into signing the agreement and had *228 told Lopez that he would only have to serve seven years. A bilingual police detective, Diaz, who participated in the plea negotiations, testified that, in his opinion, Lopez fully understood what was expected of him as well as exactly what sentence he would receive. Berk, the former state attorney who originally handled Lopez' case, also testified. He stated that, because people are sometimes afraid to testify against codefendants, Lopez had been offered protection all along. Lopez, however, never voiced any fear of anyone until he filed an affidavit with his motion to withdraw the plea.
Castro, Lopez' original attorney,[2] testified that Lopez approached him about striking a deal with the state to save himself from a possible death sentence. According to Castro, Lopez was "itching" to testify against his accomplices. Castro also stated that he explained the twenty-five-year minimum mandatory sentence to Lopez as well as the consequences of not abiding by the plea agreement. When Lopez came to court to enter his plea, he had a list of questions which, Castro testified, he thought were repetitive because he and Lopez had already discussed them.[3] Castro testified that he believed Lopez fully understood the plea and that he was being evasive at that last moment before entering the plea.
The transcript of the plea colloquy reveals that the judge questioned both Lopez and the state attorney closely about the plea agreement. Lopez repeatedly said that he understood what his sentence would be and what was expected of him under the agreement.[4] The judge, apparently, satisfied himself as to the entry of the plea and found: "the facts are sufficient to sustain your plea and that your decision to plead guilty was freely, voluntarily and intelligently made; that you have had the advice and counsel of a competent lawyer with whom you are satisfied." He then approved the agreement and sentenced Lopez to three consecutive terms of life imprisonment with a mandatory minimum sentence of twenty-five years on the homicide count.
A guilty plea "must be voluntarily made by one competent to know the consequences of that plea and must not be induced by promises, threats or coercion." Mikenas v. State, 460 So.2d 359, 361 (Fla. 1984). A trial court must inquire carefully into the voluntariness of a plea. Id. On the face of the transcript of the plea colloquy Lopez' guilty plea meets these standards. Lopez, however, testified at the *229 enforcement hearing that he did not understand the terms and consequences of his plea and that his attorney pressured him into entering the guilty plea.
Allowing the withdrawal of a guilty plea is within a trial court's discretion; it is not a matter of right. Adams v. State, 83 So.2d 273 (Fla. 1955); Adler v. State, 382 So.2d 1298 (Fla. 3d DCA 1980). The burden of proving a trial court abused its discretion in refusing to allow withdrawal of a guilty plea is on the defendant. Mikenas; Adams. After imposition of sentence, that burden means that a defendant must show manifest injustice. Adler.
The credibility of witnesses testifying as to withdrawal of a plea is in the trial judge's hands. Adams; Johnson v. State, 380 So.2d 1024 (Fla. 1979). After hearing all the testimony at the 1985 hearing, the trial judge concluded that Castro did not mislead Lopez, that Lopez understood he would have to serve at least twenty-five years, and that Lopez' claim of misunderstanding the plea agreement arose only after he "made a conscious and willful decision not to testify against his accomplices under any circumstances." In denying the motion to withdraw the plea the court found that Lopez "lied when he testified that he would not have accepted the plea bargain and entered his conditioned guilty pleas on June 13, 1984, if he had known that he would have to testify against his accomplices" and that Lopez had "made no showing that a manifest injustice has occurred in his case."
After reviewing this record, we hold that the court correctly found Lopez' plea to have been entered freely, voluntarily, and intelligently and agree that Lopez has shown no manifest injustice requiring withdrawal of his plea. Moreover, Lopez has shown no abuse of discretion in the trial court's denial of the motion to withdraw the plea. We therefore affirm that ruling.
Turning to the motion to enforce the plea, the court found that Lopez had knowingly, voluntarily, and intelligently agreed to testify against his accomplices and that he agreed to the alteration of his sentences if he failed to testify. The court held these to be legal conditions which the state could seek to enforce. After assessing the witnesses' credibility, the court found that Lopez "was never in actual fear from any threat and has refused to testify for personal reasons having no relationship to any threat," that he "freely, voluntarily, knowingly and willfully refused, and continues to refuse, to testify against his accomplices," and that Lopez fully knew the likely consequences of failing to abide by the agreement.[5] The court granted the motion to enforce the plea agreement.
Bargained-for guilty pleas are similar to "a contract between society and an accused, entered into on the basis of a perceived `mutuality of advantage.'" Brown v. State, 367 So.2d 616, 622 (Fla. 1979) (footnote omitted). In the instant case Lopez received three life sentences, rather than facing the possibility of a death sentence, in return for his testimony. When he refused to testify, he breached his contract with the state.
In a similar situation a defendant bargained for two life sentences in return for his testimony. After striking that bargain, but before the court accepted his plea, the defendant refused to testify. The state then withdrew the agreement and went to trial. On appeal this Court stated:
Hoffman had the choice of abiding by the plea agreement or not. When he refused to go along, the agreement became null and void as if it had never existed. A defendant cannot be allowed *230 to arrange a plea bargain, back out of his part of the bargain, and yet insist the prosecutor uphold his end of the agreement.
Hoffman v. State, 474 So.2d 1178, 1182 (Fla. 1985).
The reasoning of Hoffman applies to this case. Lopez received what he bargained for, but refused to provide what the state bargained for. His change of mind is not a sufficient reason for his refusal to uphold his part of the agreement. Lopez has shown no error in the trial court's granting the motion to enforce the agreement, and we affirm that ruling.
In his third point Lopez argues that the trial court erred by not holding a hearing on Lopez' competency prior to entry of his plea in June 1984. His appellate brief states that Lopez consistently displayed irrational behavior before and after the plea and cites to the transcript of the hearing on the motion to enforce the plea where the court chided Lopez regarding his rambling testimony. There is no mention in the record of the plea colloquy of any question regarding Lopez' competency; no examination was requested, and the court found the plea to have been made intelligently and voluntarily.
After the court granted the motion to enforce, counsel asked for a competency examination prior to sentencing. The court appointed three experts (Marina, Castiello, and Herrera), all of whom found Lopez competent to stand trial.[6] Although these doctors examined Lopez a year after his original plea, there appears to have been no indication  other than Lopez' uncooperativeness at the 1985 hearing  that his competency should have been questioned at any time. The witnesses at the 1985 hearing never testified that they had any questions regarding his competency, either then or before, and the trial court commented on Lopez' intelligence and obvious understanding of his situation.
Florida Rule of Criminal Procedure 3.210 directs a trial court to conduct a competency inquiry on its own motion if there are reasonable grounds to question a defendant's competency. See also Drope v. Missouri, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975). As stated before, no question regarding Lopez' competency arose until after the 1985 hearing. It appears that, rather than being incompetent, Lopez realized at that hearing that he was in real trouble and that he might not get out of it. Compare Trawick v. State, 473 So.2d 1235, 1238 (Fla. 1985) ("Appellant's despondency and his ambivalence about his plea did not constitute reasonable grounds to believe he might be incompetent."), cert. denied, 476 U.S. 1143, 106 S.Ct. 2254, 90 L.Ed.2d 699 (1986). We find no merit to this point.
The trial court found three aggravating circumstances (previous conviction of violent felony, committed during a burglary, committed to avoid or prevent arrest). Lopez now argues that the court erred in finding the murder to have been committed to avoid or prevent arrest and in not finding any mitigating circumstances. We disagree.
Lopez entered the home armed and shot the victims at close range with a handgun equipped with a silencer. Both victims saw Lopez, and, by surviving, the woman was able to identify him as their attacker. Lopez later told one of his accomplices, within the hearing of one of the state's witnesses, that he had to shoot the victims because they could not afford to leave any witnesses behind. Proof of the intent to avoid arrest by eliminating a witness must be very strong. Riley v. State, 366 So.2d 19 (Fla. 1978). We agree with the trial court's finding the evidence sufficient to support this aggravating circumstance in this case.
Lopez argues that the court should have found the following mitigating circumstances: the victim (mother) was a participant because she was involved in drug trafficking; Lopez was only an accomplice; Lopez acted under duress or domination of *231 another; Lopez' capacity to appreciate the criminality of his act or to conform his conduct to the requirements of law was impaired; and Lopez had no prior criminal history. Regarding the first claim, the police investigated the mother and found no indication that she had been involved in drug trafficking. Rather than being merely an accomplice, Lopez shot the victims. Although Lopez claims that he was under the domination of one of his accomplices, two of Lopez' witnesses (former co-workers) testified that Lopez had a strong character and was not the type of person to be dominated. All four doctors who examined Lopez found him competent, both to stand trial and at the time of his crimes.[7] Although the doctor who testified at sentencing thought Lopez to be of less than average intelligence,[8] two of the other doctors reported him to be of average or above average intelligence, and his former co-workers described Lopez as being intelligent and a fast learner. As to Lopez' having no prior criminal history, he told Dr. Marina that he had spent twenty-two months in a Cuban work camp after being charged with robbery, and he told Dr. Herrera that he would have been put in jail for four years if he had not left Cuba in the Mariel boatlift.
It is the trial court's duty to resolve conflicts in the evidence, and that court's determination is final if supported by competent substantial evidence. Stano v. State, 460 So.2d 890 (Fla. 1984), cert. denied, 471 U.S. 1111, 105 S.Ct. 2347, 85 L.Ed.2d 863 (1985). Moreover, finding or not finding that any certain mitigating circumstance has been established and any weight to be given it is within the trial court's domain, and "reversal is not warranted simply because an appellant draws a different conclusion." Stano, 460 So.2d at 894; Daugherty v. State, 419 So.2d 1067 (Fla. 1982), cert. denied, 459 U.S. 1228, 103 S.Ct. 1236, 75 L.Ed.2d 469 (1983). The court's finding that Lopez had established no mitigating factors is supported by the record, and Lopez has shown no abuse of discretion or reversible error in that finding. We therefore affirm the death sentence.
It is so ordered.
EHRLICH, C.J., and OVERTON, McDONALD, SHAW, BARKETT, GRIMES and KOGAN, JJ., concur.
NOTES
[1] The trial court also adjudicated Lopez guilty of attempted first-degree murder and burglary with an assault and sentenced Lopez to consecutive terms of life imprisonment for those crimes. Lopez does not appeal his other sentences, and our review of the record discloses no error in those adjudications and sentences.
[2] Castro withdrew from representing Lopez in the spring of 1985 after Lopez refused to cooperate with Castro or with the state.
[3] Castro and Diaz, however, returned to a holding cell with Lopez to discuss Lopez' questions again.
[4] The following exchange occurred during the June 1984 plea hearing:

The Court: ... I want to make sure that it is brought out so Mr. Lopez understands that that's [concurrent life sentences with a 25-year minimum mandatory] what he has agreed to as a sentence in this case.
Is that correct, Mr. Lopez? You heard what Mr. Rabin [state's attorney] said?
The Defendant: Yes.
The Court: Is that your understanding of the sentence you will receive as reflected by the agreement that you entered into today and signed?
The Defendant: Yes.
The Court: Has anyone threatened you, forced you, pressured you or intimidated you in any way to make you plead guilty?
The Defendant: No.
The Court: Has anyone promised you that you would receive any different sentence than the one that was just explained to you and you have agreed that you would sign and incorporate it in this agreement?
The Defendant: Okay.
The Court: My question  I don't think you were listening. Mr. Lopez, has anyone told you that you would receive any different sentence than the sentence 
The Defendant: No.
The Court: You are represented by Mr. Castro, who is here with you today; is that correct?
The Defendant: Yes.
The Court: Have you discussed these matters fully with him?
The Defendant: Yes, sir.
The Court: Are you satisfied with his legal representation?
The Defendant: Yes.
[5] After accepting and signing the plea agreement in June 1984, the trial judge told Lopez:

When you made the comment about [pleading guilty to possibly save] your life, Mr. Lopez, you were probably correct when you made that statement, and I will tell you that if you violate the agreement that you have entered into today and the matter is brought back before me, that I will impanel an advisory jury and go through the entire facts and circumstances in this case and if that jury had come back and recommended to me or I find that the aggravating circumstances outweigh the mitigating circumstances, your life may be exactly what is at stake.
Do you understand that?
The Defendant: Yes.
[6] The expert who testified on Lopez' behalf at sentencing, Marquit, also found Lopez competent to stand trial.
[7] Dr. Herrera wrote: "There is nothing in the history to indicate that this patient did not know the nature or the quality of his actions or the difference between right or wrong."
[8] On cross-examination Dr. Marquit admitted that the intelligence test given Lopez had no correction for takers not fluent or literate in English. One of the other doctors, Castiello, conducted his examination in Spanish. Given the hispanic surnames of the two final doctors (Marina and Herrera), they may have done so, too.