613 So.2d 893 (1992)
Deidre Michelle HUNT, Appellant,
v.
STATE of Florida, Appellee.
No. 76692.
Supreme Court of Florida.
October 15, 1992.
Clarification Denied March 18, 1993.
*894 Gerard F. Keating, Daytona Beach, for appellant.
Robert A. Butterworth, Atty. Gen. and Kellie A. Nielan, Asst. Atty. Gen., Daytona Beach, for appellee.
PER CURIAM.
Deidre Michelle Hunt, a prisoner under two sentences of death, appeals her numerous convictions and sentences. We have jurisdiction, article V, section 3(b)(1), Florida Constitution, and affirm the convictions but vacate the death sentences and remand for resentencing.
Hunt pled guilty to two counts of first-degree murder, two counts of attempted first-degree murder, two counts of solicitation to commit first degree-murder, one count of conspiracy to commit first-degree murder, and one count of burglary of a dwelling while armed. At the time of her plea, Hunt waived a penalty-phase jury.
The following is a brief summary of the facts developed during the sentencing hearing before the trial court. On October 20, 1989, Hunt, her lover, Konstantino Fotopoulos, and Kevin Ramsey drove out to an isolated wooded rifle range. Upon arrival, Ramsey, who had been led to believe he was being initiated into the "hunter and killer club," was tied to a tree. While Fotopoulos videotaped, Hunt shot Ramsey three times in the chest and once, at point blank range, in the head with a .22. The videotaping stopped and Fotopoulos shot Ramsey once in the head with an AK-47. According to Hunt's confession, each member of the "hunter and killer club" would be videotaped killing someone; the members then would exchange tapes. The tapes were considered "insurance policies." They served to insure that the members of the "club" would not report each other's activities to the police. According to testimony, one of the reasons that Ramsey was chosen as the victim was because he was blackmailing Fotopoulos concerning Fotopoulos' alleged counterfeiting activities and his affair with Hunt. The videotape of the Ramsey murder, which was recovered from Fotopoulos' residence pursuant to a search warrant, was shown to the trial court during the sentencing phase.
After the Ramsey murder, at Fotopoulos' request Hunt began soliciting acquaintances to kill Fotopoulos' wife, Lisa. The videotape of the Ramsey murder was used by Fotopoulos to insure Hunt's participation in his plan to murder his wife. Hunt told friends that by killing Ramsey, she had proven that she could have Lisa killed. Prior to enlisting Bryan Chase to do the job, Hunt offered three different individuals $10,000 to murder Lisa. For various reasons, either the plans never materialized or the assassins were unsuccessful in their attempts. Hunt eventually got Chase to agree to do the job. After several botched attempts to murder Lisa, Chase managed to enter the Fotopoulos residence on November 4, 1989. He shot Lisa once in the head; the shot was not fatal. After Chase shot Lisa, in accord with Fotopoulos' and Hunt's plan to get rid of the assassin and to make Lisa's murder appear to have occurred during a robbery, Fotopoulos fatally shot Chase. Hunt and Fotopoulos were eventually indicted for the murders of Ramsey and Chase, as well as the other offenses for which Hunt was convicted.
After the sentencing hearing, the trial court found four aggravating factors in connection with the Ramsey murder: 1) Hunt was previously convicted of a violent felony; 2) the murder was committed for the purpose of avoiding or preventing a lawful arrest; 3) the murder was committed for pecuniary gain; and 4) the murder was committed in a cold, calculated and premeditated manner without any pretense of moral or legal justification. As to the Chase murder, the trial court found five aggravating factors: 1) prior conviction of a violent felony; 2) the murder was committed while Hunt was an accomplice to a burglary; 3) the murder was committed for the purpose of avoiding or preventing a lawful arrest; 4) the murder was committed for pecuniary gain; and 5) the murder was committed in a cold, calculated and *895 premeditated manner without any pretense of moral or legal justification. In mitigation as to both murders, the court found 1) Hunt was physically, emotionally, and sexually abused as a child, she entered into physically and emotionally abusive relationships with men and was a prostitute for a while; 2) Hunt is a sociopath, is somewhat unstable and has a history of alcohol and drug abuse; and 3) the plea is a minor mitigating factor in view of the overwhelming evidence against Hunt. The trial court rejected Hunt's contention that she acted under extreme duress and the substantial domination of Fotopoulos, who masterminded the murder plots. The court imposed the death penalty as to both murders.
Hunt raises the following six claims on appeal: 1) Hunt's plea agreement was a contract and, under various and alternative contract theories, she is entitled to a trial on the merits or the specific performance of a life sentence; 2) the trial court erred in denying Hunt's motion to vacate and set aside her guilty plea; 3) the trial court erred in denying defense counsel's motions to withdraw and Hunt's pro se motions to discharge counsel; 4) the trial court erred in failing to find statutory and nonstatutory mitigating factors; 5) there was no voluntary waiver of a penalty phase jury; and 6) the trial court erred in denying Hunt's motion to continue the sentencing hearing.
The facts pertinent to Hunt's first and second claims concerning her guilty plea are as follows. On May 7, 1990, the State announced it was ready for trial and that Hunt wished to withdraw her previously entered plea of not guilty and enter a guilty plea. Hunt's attorney agreed that Hunt wanted to enter a guilty plea and stated that she wanted to testify at the Fotopoulos trial. Both parties waived a penalty-phase jury and agreed to leave sentencing entirely within the trial court's discretion. It was also agreed that Hunt's sentencing would be deferred until after the Fotopoulos trial so that any information coming to light during the Fotopoulos trial could be considered in Hunt's sentencing. Hunt stipulated as to the factual allegations setting up a prima facie case for the entry of the plea. Hunt's attorney stated that it had been explained to Hunt that, notwithstanding her plea and future cooperation, it was still a possibility that the death penalty would be imposed. The prosecutor reiterated that the State was in no way waiving its intent to seek the death penalty, that there had been no backroom negotiations and no understanding that the State would not seek the death penalty. Hunt's attorney explained that he had discussed the plea at length with Hunt and that they both agreed that "this plea and her offer to testify and cooperate in view of the facts and circumstances is really the only sensible and logical choice under this scenario." The prosecutor further stated that the State had not agreed that it, in fact, would call Hunt as a witness at the Fotopoulos trial.
In formally accepting her guilty plea, the trial judge outlined the plea agreement to Hunt as follows:
You would plead guilty as charged to all of the counts in the Information and the Indictment.
The sentencing phase in your case would be postponed until the Fotopoulos matter was tried and disposed of, and, ma'am, I am not sure if that is going to be one trial, two trials... . Those are things that have yet to be decided.
We would postpone the sentencing phase of your case until after the Fotopoulos trial.
There would be a sentencing phase or sentencing trial in your case. The State is going to seek the death penalty whether or not you cooperate in the trials of Mr. Fotopoulos.
My understanding is both the State of Florida and you are going to waive an advisory opinion as to life or death. You are going to try that second phase without the Jury, with Judge alone, with myself alone and it will be up to me to decide an appropriate opinion, which essentially will be either life in prison or the death penalty.
That is my understanding of what is happening.
Is that your basic understanding?
*896 To this Hunt responded, "Yes, it is." Later in explaining the significance of the plea to Hunt the court stated:
I think one of the other important things is that whatever evidence is presented in the Fotopoulos trials and my understanding from what the attorneys are saying here, you are going to testify at the Fotopoulos trials. I am going to consider your testimony and anything else that I hear in the Fotopoulos cases as part of the evidence in your sentencing hearing. I am going to take those into consideration and we definitely will have a sentencing hearing in your case.
You need to know that the State is still going to seek the death penalty and when you enter the plea, you need to be aware that certainly at this point and I think you should consider from now on, they are going to seek the death penalty no matter what you do.
Ultimately the sentencing decision will be up to me.
After thoroughly explaining to Hunt all the implications of entering the plea, ensuring that her plea was knowingly, intelligently and voluntarily made, and finding that there was a factual basis to sustain the plea, the court accepted Hunt's plea of guilty.
Prior to the Fotopoulos trial, Hunt refused to appear at a scheduled deposition. The State then requested that a sentencing date be set because it did not appear that Hunt would testify against Fotopoulos. Hunt moved to set aside the guilty plea and asked for a trial on all issues.[1] The motion was based on what the defense characterized as "newly discovered evidence" and several rather vague suggestions that the plea may not have been knowingly and voluntarily made. The defense believed that a supplemental State witness would be able to demonstrate that Ramsey had been shot with an AK-47 after he was shot by Hunt. This evidence would corroborate Hunt's contention that during the shooting of Ramsey, Fotopoulos had an AK-47, placing her in fear for her life. Finding that the "so-called new evidence" did not change Hunt's "culpability one bit," and that she "knew what she was doing when she entered that plea," the trial court denied the motion to withdraw the plea. Concluding that Hunt had refused to abide by the terms of her plea agreement the court set her sentencing, which at the prosecution's request was later rescheduled and held prior to Fotopoulos' trial. Prior to sentencing, Hunt filed a pro se motion to postpone or continue her sentencing, Hunt filed a pro se motion to postpone or continue her sentencing; however, the State's agreement that her sentencing would be postponed until after Fotopoulos' trial was not urged as a ground for postponement.
First, we find no merit to Hunt's claim that the trial court erred in denying her motion to vacate the guilty plea. It is within the sound discretion of the trial court whether to allow the withdrawal of a guilty plea. Porter v. State, 564 So.2d 1060, 1063 (Fla. 1990), cert. denied, ___ U.S. ___, 111 S.Ct. 1024, 112 L.Ed.2d 1106 (1991); Lopez v. State, 536 So.2d 226, 229 (Fla. 1988); Adams v. State, 83 So.2d 273 (Fla. 1955). Hunt has failed to demonstrate an abuse of discretion in this regard. It is apparent from the record that no good cause was demonstrated to the trial court sufficient to warrant the withdrawal of Hunt's plea prior to imposition of sentence. Fla.R.Crim.P. 3.170(f); Adler v. State, 382 So.2d 1298 (Fla. 3rd DCA 1980). The fact that Ramsey had been shot with an AK-47 was known to Hunt prior to entry of her plea. Moreover, there was no evidence presented to support defense counsel's vague assertion that his "dominant personality" may have persuaded Hunt to plead guilty.[2]
Hunt raises numerous arguments in support of her claim that she is entitled to either a full-blown trial on guilt and sentencing or specific performance of a life sentence. On this record, neither option *897 urged is warranted. However, based on the terms of the plea agreement as recited by the trial court during the plea colloquy, we find that Hunt is entitled to a new sentencing by the trial court at which the Fotopoulos proceedings shall be considered.
A guilty plea may be voided where a judge or prosecutor actually promised a defendant a lesser sentence than was in fact received. Costello v. State, 260 So.2d 198, 201 (Fla. 1972). Voiding of the plea is also warranted where "a defendant has a reasonable basis for relying upon his attorney's mistaken advice that the judge will be lenient." Id. However, this Court has made clear that
we will not void a guilty plea entered into by one who swears it is voluntarily made. Defendants who plead guilty and are given a stiffer sentence than they anticipated cannot automatically expect to receive another try at a lighter sentence. It is not enough for a defendant to argue that he was under an impression that a promise of a lesser penalty had been made by the judge or prosecutor. A reasonable basis for such an impression must be shown.
Id. In this case, there is nothing in the record to support Hunt's allegations[3] that her plea was induced by promises of a life sentence or a mistaken belief that the judge would be lenient. In fact, during the hearing at which her plea was accepted, Hunt was repeatedly reminded by the trial court, the State and her attorney that the State would seek the death penalty and that the final decision on sentencing would be in the trial court's hands.
As we recently stated in McCoy v. State, 599 So.2d 645, 649 (Fla. 1992), "when entering into a plea agreement, the State must make sure that the specific terms of the agreement are made a part of the plea agreement and the record." There was no written plea agreement in this case. The terms of the agreement were set forth by the trial court during the plea colloquy. According to the trial court's recitation of the agreement, which is quoted above, 1) Hunt would plead guilty to all charges, 2) her sentencing would be deferred until after Fotopoulos' trial so that all matters revealed during that trial could be considered during her sentencing, 3) the state would seek the death penalty whether or not Hunt cooperated in the Fotopoulos case and 4) both parties would waive an advisory jury.
Although it appears that Hunt had originally wished to testify against Fotopoulos so that her testimony and cooperation with the State could be considered as a mitigating factor at sentencing, it is clear from the record that the State's agreement that Hunt's sentencing would be postponed until after Fotopoulos' trial was not contingent upon Hunt's cooperation and testimony in that case. In fact, in addressing Hunt's subsequent motion to withdraw her plea, the prosecutor stated that "This was not a plea conditioned upon Deidre Hunt's cooperation." Thus, Hunt's refusal to cooperate at the deposition did not amount to a breach of the terms of her plea agreement as set forth by the trial court. Cf. Brown v. State, 367 So.2d 616 (Fla. 1979) (defendant cannot be allowed to arrange a plea bargain, back out of his part of bargain, and insist the state uphold its end of the agreement); Lopez, 536 So.2d 226 (when defendant refused to testify against accomplices, he breached his plea agreement which included agreement to testify against them in exchange for life sentences.)
A "constant factor" insuring basic fairness in the plea bargaining process is the requirement that "when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." Santobello v. New York, 404 U.S. 257, 262, 92 S.Ct. 495, 499, 30 L.Ed.2d 427 (1971). It appears that defense counsel planned to rely on much of the evidence presented by the State in the Fotopoulos case to establish *898 that Hunt was under extreme emotional distress and the substantial domination of Fotopoulos at the time of the murders. Thus, it was to the defense's advantage for Hunt's sentencing judge to consider all the evidence presented in Fotopoulos' trial whether or not Hunt testified in that case. Because Hunt was entitled to the benefit of her bargain, which the State made clear was not contingent on her cooperation, it was error for the court to sentence her without the benefit of the evidence presented in the Fotopoulos trial.
We reject Hunt's claim that the entire plea agreement was rendered null and void when her sentencing was held prior to Fotopoulos' trial. Unlike Hoffman v. State, 474 So.2d 1178, 1182 (Fla. 1985), it is not necessary to treat the plea agreement "as if it never existed" to do justice in this case. In Hoffman, in exchange for the State's promise to recommend a life sentence, the defendant agreed to plead guilty to two counts of first-degree murder and to testify against his codefendant. However, when Hoffman reneged on the agreement to testify, the State withdrew from the bargain and proceeded to prosecute him and seek the death penalty. This Court concluded that the agreement should be treated as null and void because "a defendant cannot be allowed to arrange a plea bargain, back out of his part of the bargain, yet insist the prosecutor uphold his end of the agreement." 474 So.2d at 1182. In this case, Hunt's testifying against Fotopoulos was not a term of the agreement as set forth by the trial court during the plea colloquy. Therefore, Hunt's failure to testify did not entitle the state to proceed to sentencing prior to Fotopoulos' trial. Cf. Lopez, 536 So.2d at 229 (state was entitled to seek death penalty when defendant who had received three life sentences in return for his agreement to testify against accomplices later refused to testify).
When an agreement with the defendant has not been fulfilled, the defendant is entitled to specific performance of the unfulfilled promise or to withdrawal of her guilty plea. Santobello, 404 U.S. at 263, 92 S.Ct. at 499. In this case, we believe that specific performance is an adequate remedy.[4] Fotopoulos' trial, at which Hunt in fact testified, has been completed. In that trial, the State took a position concerning Fotopoulos' influence over and domination of Hunt contrary to that taken at Hunt's earlier sentencing hearing.[5] At the sentencing hearing, the State maintained that Hunt was in no way acting under extreme duress or under Fotopoulos' substantial domination. However, during Fotopoulos' trial, Hunt was portrayed by the State as being abused and terrorized by and otherwise under the total domination of Fotopoulos.[6]
*899 We find no merit to Hunt's claim that the trial court erred in denying her numerous motions to discharge counsel. We have stated that
[w]here a defendant seeks to discharge court-appointed counsel due to alleged incompetency, it is incumbent upon the trial court to make a sufficient inquiry of the defendant and counsel to determine wither there is reasonable cause to believe that counsel is not rendering effective assistance.
Watts v. State, 593 So.2d 198, 203 (Fla.), cert. denied, ___ U.S. ___, 112 S.Ct. 3006, 120 L.Ed.2d 881 (1992); see also Hardwick v. State, 521 So.2d 1071, 1073 (Fla.), cert. denied, 488 U.S. 871, 109 S.Ct. 185, 102 L.Ed.2d 154 (1988). However, our review of the record reveals that the trial court made adequate inquiry into each of Hunt's repeated claims of ineffective assistance of counsel. Moreover, Hunt was not entitled to an inquiry on self-representation under Faretta[7] because she made no unequivocal request for self-representation. Watts, 593 So.2d at 203; Hardwick, 521 So.2d at 1074. Numerous times during the hearings on her motions, Hunt stated that she did not want to represent herself and agreed to continued representation by court appointed counsel. At one point Hunt expressly agreed to continued representation even after the trial judge informed her that he would probably appoint new counsel if that was her desire.
Finally, we find no merit to Hunt's claim that she did not voluntarily waive a penalty-phase jury. Her position appears to be that although her waiver of an advisory jury clearly was voluntarily made at the time she entered her plea, the waiver was not effective because the plea agreement was rendered void when she was sentenced prior to Fotopoulos' trial. During the plea colloquy, it was thoroughly explained to Hunt that she was giving up her right to an advisory jury as part of the agreement. The trial court's finding at the time of accepting the plea that Hunt's decision to waive an advisory jury was made knowingly and voluntarily is supported by the record. We have previously rejected Hunt's underlying premise that the entire agreement was rendered void.
Accordingly, we affirm Hunt's convictions and lesser sentences but vacate the death sentences and remand for resentencing by the trial court after consideration of the record in the Fotopoulos case.[8] On *900 remand, both the defendant and the State shall be allowed to present evidence and argument on any mitigation touched on in the Fotopoulos record.
It is so ordered.
BARKETT, C.J., and OVERTON, McDONALD, SHAW, GRIMES, KOGAN and HARDING, JJ., concur.
NOTES
[1] A second motion to withdraw plea and set for trial was filed prior to sentencing. However, that motion was treated as withdrawn.
[2] Hunt alleges numerous additional grounds for withdrawal of her plea which are not cognizable in this proceeding because they were not presented to the trial court.
[3] Affidavits in support of these allegations filed for the first time with this Court have been stricken.
[4] The fact that no formal motion to enforce the plea agreement was filed does not preclude us from granting relief. Once the trial court erroneously determined that it was Hunt who had breached the agreement, a formal motion to enforce the State's agreement to postpone her sentencing until after Fotopoulos' trial and further argument on that subject would have been futile. Such futile efforts are not required to preserve matters for appeal. Thomas v. State, 419 So.2d 634, 636 (Fla. 1982); Spurlock v. State, 420 So.2d 875, 876 (Fla. 1982); Brown v. State, 206 So.2d 377, 384 (Fla. 1968).
[5] We granted Hunt's motion to take judicial notice of the record in Fotopoulos v. State, 608 So.2d 784 (Fla. 1992). §§ 90.202(6), .203, Fla. Stat. (1991); Kelley v. Kelley, 75 So.2d 191 (Fla. 1954). However, we do not reach the merits of Hunt's contention, which was made in a notice of supplemental authority to her motion for judicial notice, that the State's portrayal of Hunt as a victim in the Fotopoulos trial must be treated as "judicial admissions by a party opponent." See United States v. Salerno, 937 F.2d 797, 811 (2nd Cir.), modified, 952 F.2d 623 (2nd Cir.1991), reversed on other grounds, ___ U.S. ___, 112 S.Ct. 2503, 120 L.Ed.2d 255 (1992); United States v. Bentson, 947 F.2d 1353, 1356 (9th Cir.1991), cert. denied, ___ U.S. ___, 112 S.Ct. 2310, 119 L.Ed.2d 230 (1992); United States v. GAF Corp., 928 F.2d 1253, 1259-62 (2d Cir.1991); United States v. McKeon, 738 F.2d 26 (2d Cir.1984).
[6] For example, while urging the admission of testimony concerning Fotopoulos pointing guns at Hunt and burning her breast with a cigarette, the prosecutor stated:

Your Honor, the testimony will reveal a significant beginning of a pattern of intimidation and terror inflicted upon the witness to terrorize her and break down her will ultimately and obtain complete control of her, ultimately resulting in her carrying out the various crimes with which she had pled guilty.
Even though it does mention other criminal conduct of the defendant, it is not offered for that purpose. It is offered for the purpose to show a clear pattern of physical assault, abuse, intimidation and coercion an  and the direct and primary cause of Deidre Hunt's criminal activity.
Later in the proceedings, in urging the admission of other evidence the prosecutor stated:
We're not offering them for the truth of the statements at all ... but only for the fact, one, that they were made, and number two, that they had an impact on [Hunt], in effect, paralyzed her, stopped her from feeling she could go to anyone or talk to anyone or escape from the circumstances, and that she had a growing paranoia that [Fotopoulos] had utter control of her life and she could not escape.
After being asked by the court if Hunt's state of mind was relevant, the prosecutor maintained:
That  [Hunt's] ultimate explanation as to why she participated in the first murder of Kevin Ramsey will be, we believe, Your Honor, that it was primarily if not exclusively out of terror for her own life and safety, and that the second murder was levered basically into her life through the first murder and the videotape and the continuing threats of imminent peril and death.
... .
And I think this goes to the total  the totality will show that she in her own mind is a virtual prisoner, a hostage.
In arguing for the admission of Hunt's testimony concerning Fotopoulos' threatening her with a "billy club" like object that could shoot knives out one end, the prosecutor stated:
If Your Honor please, it is becoming part of a continuing pattern of domination, threat and intimidation which ultimately deprived Deidre Hunt of the ability to even resist let alone disobey. And it's  it was fired in one of the dwellings in which she was residing near her by Kosta Fotopoulos before the Ramsey killing. And it goes towards her mounting fear that this man was going to kill her if she didn't do his every bit 
[7] Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).
[8] Because we vacate the death sentences and remand for resentencing, we need not address Hunt's claims that the trial court erred by not finding certain mitigating factors and by failing to grant her pro se motion to postpone sentencing.